I am pleased to court John Daum for Appellant Asiana Airlines. This is an action for breach of a contract to provide air cargo services. Breach is not in dispute, and the only issue is the proper measure of damages. There is no dispute that that issue is governed by Oregon law. It is Asiana's position that the measure of damages for breach of a services contract under Oregon law is clear, and that the district court misapplied Oregon law in several respects, each of which independently requires reversal. These errors of law go to whether sufficient evidence was presented to the jury to allow an award of lost profits damages. If we are right about the law, the judgment needs to be reversed with instructions to enter judgment for the defendant. The errors also go independently to whether the jury was correctly instructed, and if we are right about that, reversal on a new trial will be required. There appears to be no dispute that Asiana properly preserved its legal positions in the trial court, and that the district court's errors are properly subject to review here. Evergreen's brief does not argue otherwise. The simplest of the errors requiring reversal is that the district court did not confine the damage recovery to lost net profits, which are the only lost profits damages that Oregon law allows. The Oregon cases are consistent that only lost net profits can be recovered. And what the cases mean by net profits is that overhead and certain other fixed expenses, like the costs of owning income-producing assets, must be deducted in calculating lost profits. Well, except the UCC provides for the inclusion of overhead, right? Yes, it does, Your Honor. The UCC does not govern here. I know that, but you say Oregon law is clear, but you can apply analogy. You could apply it here. Well, the Oregon, the common law of Oregon embodied in the case law is clear that only net profits are recoverable. I agree that the relevant provision of the UCC would appear to permit recovery of reasonable overhead, but this is not a case governed by the UCC. It's governed by the common law of Oregon. Oregon's rule is a minority view. It agrees with the law in some states, such as Hawaii and Utah and Idaho, but most states do not require deductions of overhead and fixed expenses in calculating lost profits. Nevertheless, the rule is established in the Oregon common law cases, and it was binding on the trial court and it's binding on this court in a diversity case. Evergreen's damages proof clearly did not deduct overhead and fixed expenses as required by Oregon law. Mr. Kinrich was Evergreen's damages witness. He calculated what revenues Evergreen would have earned under the Asiana contract. He subtracted some expenses he considered fixed, like the cost of ownership of Evergreen's airplanes or overhead. Well, let's get down to specifics. The cost of the airplane. In this case, would it have cost Evergreen a single dollar more if, taking its theory, I know you have a separate argument on that, but taking the lost volume theory, if it had been able to fly the flights for your client, it's already paid for the airplane, so what additional cost would it improve because of the cost of paying for the airplanes? Well, it hadn't actually paid for the airplane, Your Honor. I mean, it had paid for the airplane, but it continued to have costs for depreciation and interest, which it calculated. But depreciation doesn't change depending upon how much the airplane is used, does it? No, but I think the way to look at the cost of owning an asset is this. Let's assume that Asiana had breached, and Evergreen had no change in its business. And it had, as was the case, there was a plane dedicated to flying the Asiana contract. On those facts, you would Evergreen to sell that airplane. It wouldn't incur depreciation. It wouldn't incur interest on the loan. It wouldn't incur any cost. The cost of owning that airplane, when you don't have the Asiana... No, I think that's only an argument that, you know, he's got to mitigate and he can't go after lost volume. That's what you're saying. You're saying he has to sell it. It's also an argument that the cost of owning the airplane is not part, should be deducted in calculating lost profits. But the fact is here, Asiana was not Evergreen's only other customer. True. And therefore, they kept the plane to service their other customers. And it's reasonable that the costs of owning that other airplane, therefore, should be counted against the revenues that Evergreen got from its other customers. But as Judge Clifton says, there's no additional expense. It's being depreciated and so forth already. Right? Yes. But this is like, this is like Bono Sales and Local 70 and Local 137, Your Honor, if you look at it that way. Here you have an income-producing asset, which is put to other productive use for which Evergreen is paid. The cost of using that asset ought to be charged not against Asiana's contract, but against the other customers who were paying Evergreen to use that plane and who ought to absorb as part of their price the cost that Evergreen incurs in owning and operating that plane. Well, in a fashion, that's what Evergreen is saying, that the cost was carried by those other contracts. But we could keep flying enough so that without adding any capacity, without adding another plane, and hence without adding to its costs, we could fly your client's flights, too, and that money would just be gravy. Where in Oregon law are they not allowed to claim gravy? Well, the Jenks v. Larimer and Pompelli v. Reeves, Your Honor, say that when you calculate net profits, you have to deduct the cost of owning income-producing assets, and you have to deduct overhead. Take the Pompelli case. Plaintiff was running a carpet-laying business. He asked for lost profits damages measured by the jobs he said he would have been able to do, and he calculated those just as Evergreen did here by measuring his revenues, and I don't think he subtracted his variable costs, but he took his revenues. And the Supreme It's fair to assume that he had at least some expenses of operation, including overhead, which must be deducted in arriving at the amount of his net earnings. Now, the overhead didn't change. It was just that the Supreme Court of Oregon said you had to apportion some of that overhead to the jobs that he would have lost and deducted it. That's the meaning of the Oregon rule, that only lost net profits are to be the measure of damages. Well, as I looked at a good number of cases, which I confess have blurred together, as I'm looking at it now, this is the person who was injured in an accident and so couldn't do his carpet-laying business? Correct, Your Honor. And the Oregon cases seem to apply exactly the same rules to lost net profits in tort and in contract. The cases interchangeably cite each other. Now, did he conduct his business at a lower capacity during the time that he's laying claim for damages? It's my understanding that he did, that he was claiming that he couldn't get particular jobs and he ought to be compensated for those. Do you know if the case is clear? Because when I went through it, I did not get the impression that he had already, in those other jobs, borne the same costs that were being deducted by the court here as overhead. Well, I assume the overhead of his business, I mean, we don't have all the facts, but one assumes that the overhead of his business continued throughout the period that he was injured and had to be applied both to the jobs that he was able to do before he was injured and to the jobs that he claimed he was lost after he was injured. Well, I'd like to ask a question about the, you mentioned the UCC, Oregon has adopted the UCC, right? Yes, many years ago. And that does apply the lost volume to sales of goods in the Trianco case, right? Let me concede that for purposes of discussion, Your Honor. Yes, there's a controversy about how the UCC ought to be interpreted, but let's put that to one side. Well, this would just be a matter of extending that from sale of goods to the services. Why isn't that a reasonable extension? Because the situation of sale of services is very different from the sale of goods. The core situation of the lost volume seller theory addresses is the manufacturer who has an inventory of goods. If one sale is lost, it's perfectly easy to pick another widget out of inventory and give that to the breaching party. So you really do have two sales. That isn't the situation that's presented here. Evergreen doesn't say, we had idle capacity. We had a plane that wasn't working. We could have devoted that plane to the Asiana contract. What Evergreen says is, we could perhaps have flown a completely different schedule than the one we did fly. And if we had done that, we might have been able to service the Asiana contract as well as the other business we had. So it's not at all a simple matter to extend. But that was the question that was submitted to the jury, was it not? Yes. As to whether they really had the capacity and whether they could do it and so forth. Well, and that was submitted to the jury, Your Honor. But your question was, is it a matter of sales governed by the UCC to services contracts? And the answer is, it is not at all a simple matter because a services provider isn't in the paradigm situation that the UCC contemplates of a seller with goods in inventory which can be readily transferred from one buyer to another buyer. Services contracts are very different, as the facts of this case indicate. Mr. Donovan, this is obviously a very interesting discussion, but I'm also interested in your position on the issue of whether Oregon permits loss volume recovery in the first place at all and whether we ought to certify this question to the Oregon Supreme Court. Well, it's, you know, it is our view that the Oregon cases are quite conservative about contract damages. We think, as I have said, that they require a deduction of overhead. We think that they require a deduction of the cost of income producing assets. If they do that, if we're right about that, and I think we are if you read the cases carefully, then the Oregon service contract cases are inconsistent certainly with the provision of the UCC that permits reasonable overhead. And we think with the general proposition that you can have lost volume seller damages because the whole theory of recovery in the requiring deductions against profits for overhead and for the cost of income producing assets is inconsistent with the lost volume seller idea, which says we look only, we assume that all the overhead, that all the cost of income producing assets are borne by the other business that the plaintiff has, not by the contract that was breached. The Oregon cases do something different. They say, no, you look at this as an accountant would. If a company has ten contracts and an accountant is asked, what's the profit from each contract? The accountant says, all right, we've got to apportion overhead. We've got to apportion fixed costs over those ten contracts, and we calculate profits for each one, and the profits we calculate for each one better add up to the company's total profits. That's how an accountant looks at these issues. We submit the Oregon cases, look at profit the same way. If you had ten contracts and you calculated profit on each of those contracts the way Evergreen wants to, then you'd end up with a company that would have two or three times as many profits as its actual total profits because the fixed costs and overhead would never have been deducted. So we think Oregon law looks at these matters like an accountant does, requires that depreciation, interest, overhead be spread across all contracts, and you calculate profits that way. That's inconsistent. That's inconsistent with the lost volume seller idea. And therefore we think that a state as conservative as Oregon would be unlikely to adopt the lost volume seller idea. If the court is prepared to get to that conclusion, fine. We think that would be great. But if the court is in doubt as to what an Oregon court would do, this is a classic situation where the court ought to ask the Supreme Court of Oregon what it would do about this case, whether it would adopt the lost volume lessor idea, or whether it would adhere to its conservative tradition. Was the request for certification made in the district court? Not to my knowledge, Your Honor. It wasn't, was it? It was not. And I couldn't tell you offhand, indeed, if certification from the district court is possible. I assume from Your Honor's question that it is, but I didn't know that. In any event, no request was made. Let me just cover briefly our basic point about supporting data. The fact is here that the key factual question that was presented to the jury that lies at the heart of the case was, how do you handle this contract together with all the other business that it got after 9-11? It's, and we point out in the briefs that they got so much business after 9-11 that you only have to assume that, you know, if the constraint of having to keep a plane for the agent and a contract would have reduced their military business by no more than 4%, they wouldn't have been injured in the slightest. And they make the basically implausible argument that in a time when they could have gotten every bit of business that they wanted from the military, that they still reserved enough capacity to supply the Asiana contract. And I say to you, if they had that capacity, why on earth didn't they take on additional military business and use that capacity? That's the factual issue. And that's the background against which the legal issue comes up, which is, what is the kind of proof that's required to make a, under Oregon law, to support a claim for lost profits damages? And in this record, you have two kinds of evidence. You have historical documents which shows what they did and which shows that their existing flight schedule was incompatible with the Asiana contract. And you have vague general testimony from their executives that says, yes, trust me, we could have done it. That's inconsistent with the requirements of Oregon law, which requires supporting data, not just the say-so of the executives of the plane. And the Oregon, the reason for that is Oregon law doesn't trust, doesn't think that it's right that millions of dollars in damages should be awarded just because an executive says, trust me, we could have done it. I'll reserve the rest of my time for rebuttal unless the court has questions. This is a preliminary matter. Does Oregon law permit certification from a district court? Your Honor, my understanding is, I'm not sure whether it does from the district court. I do know that they have a statute that does permit certification. I'm not sure, however, whether certification can be made from the district court. My intention wasn't to lead with that issue, but I think this court is fully competent to decide the law here, as I will argue. I don't think there's anything unusual about what the court did below that requires any sort of further guidance by the Oregon Supreme Court. In August of 2003, excuse me, August of 2001, Asiana breached this contract. The contract provided for Asiana to operate one 747-200 cargo airplane for three years. When it breached, it left Evergreen with 18 months of lost revenue and additional capacity in its fleet. In February of 2003, the jury in this case awarded Evergreen damages, and what those damages were were simply the benefit of Evergreen's bargain that it would have had with Asiana. The jury restored Evergreen to the position it would have been in had there been no breach. And so, Your Honors, we believe that this case should be affirmed for at least three reasons. First, Evergreen was awarded nothing more than its net lost profits under governing Oregon law. Second, Oregon had... Well, when you say net profits, though, but you did not deduct overhead, right? Your Honor, we did deduct portions of overhead. The critical... Well, a lot of overhead you didn't, and, you know, in your argument on that section, you don't cite a single Oregon case that supports your position outside of the UCC context. Is there a case that supports your position outside of the UCC context? I believe the case that supports our position is the Shook case, which was the case involving the travel lodge. That court set forth the measure of damages under Oregon law for breach of a contract. It said that the party who has suffered a breach is entitled to receive the value of the performance minus the costs avoided. It didn't say minus all overhead. It said minus the cost avoided. And the interesting thing is that at the trial of this case, Mr. Menenberg, who was Asiana's certified public accountant... My answer is no, you really don't have a case, do you? There is no... I don't consider that direct support for, you know, including overhead and net profits. Well, the question that Oregon courts ask juries to decide is whether or not an overhead expense was avoided. We did deduct components of overhead. We did not deduct all overhead. We did not deduct those portions of overhead that were not avoided by Asiana not operating. For example, the interest expense on the airplanes didn't change whether or not Asiana was in the program or not. The insurance on the airplanes didn't change as a result of Asiana being in the program. But some things did change that constitute overhead. Things that changed were, for example, the maintenance expense on the airplanes. Asiana says that we didn't give credit for depreciation. Well, the wear and tear component of depreciation is in the maintenance aisle of the ledger. And that is the evidence that Evergreen put on that was deducted in a substantial amount because we didn't fly for Asiana. We also deducted the cost of crew expenses. It is the case that in the headquarters in McMinnville, Oregon, Evergreen did not have to lay off clerical workers or engineers or flight schedulers because Asiana breached. But because we weren't flying the airplane for Asiana, we had to let go some of the crew members. And that amount was deducted and quantified. But the testimony that the jury heard on the question of net loss profits was did we avoid those now and took issue with us? This was a pure question for the jury to decide whether or not we had provided evidence of our net loss profits. And under the Zare decision, which is the 1996 Supreme Court decision of Oregon, the court again followed the restatement rule, which the Shook Court did as well, and said that the party who has been breached is entitled to be put back in the position he otherwise would have been placed in. The cases that some sort of a bright-line rule that overhead is always to be excluded don't stand for that proposition. In the majority of those cases, I think in six out of the eight cases that they cite, the plaintiff sought recovery of gross profits. There was no evidence at all submitted of any of the costs, let alone costs that were avoided. And I think I heard counsel for Asiana this morning admit that in the Pumpley case, that was exactly the case, that the plaintiff didn't put on evidence of any of the costs that were avoided by not operating the contract. And as this, as Your Honors noted earlier, this court need look no further than the decisions in the Triangle and the Stanfield decisions to know what an Oregon court would do. It is true they were UCC cases. I think the UCC does offer good guidance with respect to contract cases. But the Oregon courts, if they wanted to adopt Asiana's philosophy that overhead should always be excluded, could easily have said, we're not going to enforce that part of the UCC. And they chose not to. There's a second reason why this decision should be affirmed, and that is that the court properly instructed the jury that if Evergreen could prove that it had the capacity to fulfill the Asiana contract and all of its other business, that it was entitled to damages for the breach of the contract. This is really no different than the flip side of mitigation, which is what Asiana also attempted to prove to the jury. Asiana's expert witness said to the jury, as Asiana says to this court, Evergreen didn't have the capacity to fly for all of these other customers. They could not have taken on that business had it not been for Asiana's breach. They asked the trial court to give an instruction on mitigation, and the court did. But the court also gave the instruction that if Evergreen could prove that it had the capacity and that it could and would have fulfilled those additional contracts in addition to Asiana, that the jury was entitled to consider the damages Evergreen suffered from the Asiana breach. Okay. What did that proof consist of? The proof that Evergreen presented was substantial, in my opinion. And one point to clarify, there seems to be a difference between the sides here as to what the standard is. I think the standard subject is reasonable probability, and in the Lazaire case interpreted that to be the preponderance of the evidence. I think we went well beyond that. The evidence that Evergreen presented constituted first of the testimony of its flight schedulers, people who do this day in and day out. Those witnesses testified in the manner in which Evergreen schedules its fleet. They also testified that Asiana is not a last-minute customer that can advance on a prospective basis. Asiana says Evergreen can't recover because it didn't put on a flight schedule that showed how Asiana could fit into the system. Well, that fundamentally misinterprets the way Evergreen schedules its fleet. And Asiana attempted to provide that evidence to the jury. They had their expert witness say, here's the way Evergreen would have scheduled it had there been a breach. And the jury rightly disregarded that testimony because it was not based upon supporting data. It was not based upon the evidence in the record. Well, as I understand it, Asiana is arguing that its flights could not have been fit into the schedule of what Evergreen actually flew. And Evergreen's counter is, well, we would have scheduled Asiana first as a long-term customer. And there would have been sufficient business available to fill in the holes around Asiana. In the end, is the evidence anything more than the flight scheduler saying, well, I do this and I could have done it and there would have been the business there? It's far more than that, Your Honor. It consists of flow sheets which depict the actual flights that took place after Asiana's breach. Let me pose what's really bothering me here. Certainly. It seems to me the premise of this argument is that the business is there to be gotten. And so you could reach out and find this job that you could have sold the plane for, sold on the flight floor, and put it into whatever holes were left over with Asiana. And yet if you're arguing you have excess capacity, that suggests that, well, there's not enough business there to fill in because you've got excess capacity as it is. You can't find the other jobs. You're competing and can't do them profitably. Well, that troubles me. Well, I don't believe it was our position. I don't think the evidence was that Evergreen had an unlimited supply of customers. I think the argument was we had an unlimited capacity to serve customers. At the time of the breach, which was approximately two weeks before the tragedy of 9-11, Evergreen's was woefully under-occupied. There were even airplanes that were stored at their facility in Arizona because there wasn't enough business to fly them. The point we're making is that the business that came afterwards, which was predominantly the expansion work of the United States military in the ramp-up to the Afghanistan war and the Iraq situation, that that put Evergreen in increased opportunity. It was not an unlimited opportunity, however. The evidence below was that Evergreen got a portion of that expansion work as a member of one of the bidding teams of a number of different airlines, but that Evergreen took all that it was entitled to, which I think the evidence shows was approximately 55 percent of that business. It took all that it was entitled to. Our point and the evidence below was that had Asiana been in the system at the time, we would have still had that 55 percent of the revenue available from those military flights, but we would have taken a different routing of those in order to accommodate the Asiana schedule. Now, could we prove with exactitude what those were? We were at a disadvantage, but the law in Oregon states that when a party has suffered a breach, the position that you're put in that creates a difficulty of proof doesn't require mathematical certainty in establishing your right to damages, and that's why in the Oregon Supreme Court decision in Zaire, the court said that a plaintiff who's seeking lost profit damages is held to a preponderance of the evidence basis, but we also showed some additional evidence, I think, Your Honor, in terms of capacity. Evergreen used as a forecast 300 hours per month per airplane that it would be able to fly for a customer. Before the breach, there were not many times when Evergreen was able to achieve that. The testimony of our expert witness was that demonstrates Evergreen has capacity, but there was evidence to support that. There was evidence in the block hour reports after Asiana's breach where Evergreen flew on an airplane-by-airplane basis well more than 300 hours. In November of 2002, the fleet as a whole averaged more than 300 hours. Did it happen every month? No, it didn't happen every month. That's why we had excess capacity. You have a total, I think, of 10 planes, right? That's correct. But only two of them were available with side door entrances, which is what Asiana required under their contract. That's correct. So isn't that what we're talking about, the capacity for those planes? Well, let me clarify what I understand our evidence was. Evergreen had two customers at the time of the breach that required that specific model airplane. In Evergreen's fleet, they had a series of 747-100 models. They had 747-200s that opened at the nose, and then they had actually three of the 747-200 side cargo doors. So one of them was... One of them had been acquired but had not gone through its FAA-required maintenance program, which it did actually not long after the breach. But the point is that at the time of the breach, there were only two customers that required the use of a side cargo-loading 200 airplane, Asiana, which flew it more or less full-time, and Finnair, which flew it only once a week. And so when Asiana breached the contract, Evergreen was left, and the evidence established without dispute throughout the rest of the contract, Evergreen was left with only one customer that required a 200 side cargo door, and that customer only used that plane on one trip to Finland and back per week from New York. So did we have the capacity with respect to a 200? I think the record was quite clear on that. But the evidence that was presented was that Evergreen doesn't use its airplanes on a specific model basis unless the customer asked for it. All of the military business that Evergreen performed had no specification as to airplane type. Evergreen commonly would use the 100 airplanes. They had the same interior capacity. They could carry all of the goods that the military wanted to have shipped, and they could then have their other airplanes available if somebody else wanted a later model airplane. But the point is that Evergreen kept their planes moving as much as they could because it's economically important to utilize those airplanes. The maintenance expense that we deducted is something that accrues under the FAA regulations whether the planes are operating or not. And so, yes, Your Honor, it was a potentially constraining situation, but not one that the FAA has ruled out. I'd like just briefly, unless the Court has any further questions, to emphasize that I think that Oregon law, whether we're talking about the question of the measure of damages of lost net profits or whether or not the lost volume concept would be approved in Oregon, that that is not a matter of real speculation under Oregon law. The Trinco and the Stanfield cases both approved the lost volume statute that was approved by the Oregon legislature. If they had difficulty with those concepts, they would have raised them then. The Court did not. And the Stanfield decision, by the way, was denied review by the Oregon Supreme Court, not necessarily an earth-shattering precedent. But nonetheless, the Court had the opportunity to look at that issue. We don't think it's controversial. We don't think an extension is even necessary under the benefit of the bargain rule that is established by Zare. And so if I might just conclude, the jury was properly instructed. The jury was properly instructed to deduct only those costs that Evergreen avoided from the lost revenue that it sustained as a result of the breach. And that Evergreen was entitled to prove to the jury whether it had capacity to fulfill the later contracts and to also fulfill the Asiana contract. And that Evergreen did meet the reasonable probability standard under Oregon law. And for those reasons, Your Honors, we respectfully request that you affirm the judgment below. Thank you. Mr. Dahlman. Thank you, Your Honor. Just a few brief points. Mr. Hobart referred to the Trineco and Stanfill cases and tried to give the impression that in those cases the Oregon Court of Appeals had actually addressed any of the issues that are presented here. It is true that in the Trineco case there appears to have been an award of overhead. It is true that in those cases they quoted the UCC provision. There is not a word in those cases as to whether lost volume is a sensible way to deal with any of these issues. There is not mention, discussion, distinction, a single word about any of the Oregon cases on which we rely. So to say that those are cases for it's perfectly clear that what happened was there was a statute before the Court of Appeal. The Court of Appeal applied that statute. It gave no thought to whether the law was otherwise in other circumstances not presented. So the cases are what they are, but they don't begin to deal with the issue presented here. Second, it was asked what the evidence was other than the testimony of Evergreen's executives. The answer was flow sheets. Well, flow sheets are historical documents. They show where the planes actually were. One's in the appendix to the brief. If you look at it, you can see that the flow sheets show that the actual schedule that was flown was inconsistent with buying the Asiana contract. Second answer was block hour reports. Matt, may I finish on this point? You're on it. We'll see how long the answer takes. Okay. The second point was block hour reports. Those, again, are historical documents, what was actually flown. They're useless for purposes of making up a schedule. If you had a plane that flew every other day, flew one day on, one day off, its block hour report would show it was half empty. That plane could not fly from New York to Seoul, which was what the Asiana contract called for, because that's a two-day round-trip flight. So you need a schedule. Evergreen could have prepared a schedule. They had expert schedulers. They had all the advantages in the world. They could have called everything in their favor. They didn't put up a schedule. The Oregon cases require supporting data, and they didn't give it. Thank you, Your Honor. Thank you. The case just argued is submitted. The next case in the calendar, ASW v. State of Oregon. Thank you, Your Honor. Thank you.
judges: Hug, Tashima, Clifton